We'll hear argument next in Case 16-254, Water Splash v. Menon. Mr. Gaston. Thank you, Mr. Chief Justice, and may it please the Court. At issue in this case is whether the Hague Service Convention permits service of process by mail if the state of destination does not object. Our position is that such mail service is allowed, and it's a three-part argument. First, purely textual evidence of meaning shows that this reading of the treaty is at least reasonable. Second, some additional considerations, namely this Court's decision in Schlunk, as well as the history of events leading up to the treaty, further confirm that this is a reasonable reading of Article 10a. Sotomayor, your adversary basically starts from the proposition that this text is unambiguous. Yes. Do you agree with that proposition? No. We do not agree the text is wholly unambiguous. We believe the text begins as very ambiguous, looking at Article 10a, b, and c, and b, and c, where a uses the word send, b and c use the word affect service, and instantly just looking at that small area, one says, well, wait, what does send mean here? Does it mean send to serve, send for nonservice, send for both purposes? Is it the same or different than to affect serve? And we have a presumption that has been used in the statutory context that different words are usually going to mean different things. It's not an irrebuttable presumption, but even that presumption leaves ambiguity because it's so ambiguous. So why do you think the drafters use those two different phrases? What's your best answer? The best there's a practical answer and then there's a legal answer. The practical answer, and this involves the circumstances leading up to the treaty, is that there were three prior treaties dating back to 1896 where a French term, addressee, was used in the analogous provision, and that in French was also not a term of art for service. There were two other French terms of art for service, and the Convention used notification and signification as terms for service. And then in this section, which was 6-1 of the earlier treaties, at least of the 1954 treaty, it used the term addressee, and in context it was very clear that it meant service because there were other references to service later in that section, and it was understood to mean service because the term in French was broad enough to cover service. And what happened in 1964 during the drafting of the treaty adopted in 1965, they had to prepare for the first time an English version of the treaty because they would have two texts, French and English, and as a practical matter, what they did is they took that language and simplified the article to which it would be part of, and it lost some of its context. Kennedy Is it fair to say that your first argument, you were talking about the first argument of text, but then it seemed to me that you went a little bit beyond text, is one of your arguments that maybe sand is ambiguous when you look at A, but when you look at B and C, you know why they use the word sand, and so it's not ambiguous any more. You know it's ambiguous. The much better interpretation is your interpretation just by looking at A, B, and C. Is that your argument? Is that your first argument? Now, the first argument is that all there is quite a bit of textual evidence beyond A, B, and C that suggests sand in Article 10a means serve. Right. Despite a presumption that different words usually mean different things. And that first happens as you draw outward from A, B, and C to Article 10 as a whole, which has a right of objection by a state of destination. So states that are party to the treaty can object to Article 10a or 10b or 10c. And if 10a means sand for nonservice purposes, it's basically saying, okay, you can sand these judicial documents for unofficial, nonlegal, nonbinding purposes, unless the state of destination objects. Alitoso, there is a body of law, a body of international law regarding the way in which treaties should be interpreted. And there are certain rules about the interpretation of treaties. But treaties are also the law of the United States. So the question that you started out answering is a rule for interpreting laws of the United States. So what do we do in a situation where there might be a conflict between these two bodies of interpretive standards? And I think, luckily, this case I don't think brings up the conflict, because the only way you remove the ambiguity in a way against Petitioner's position is to take a canon that words usually mean different things and make it irrebuttable. And that's not the law under Federal law. This Court has not applied that canon in some situations. And here you get to a greater meaning by, and if I could carry out the answer to the state of destination objecting, it would be very odd to put in a treaty about service some provision that to allow States to object to the use of their mails for unofficial purposes. It really, I think, most people would say, well, before the treaty I could use the mail for unofficial purposes. After the treaty, I ought to be able to use the mail for unofficial purposes. And even the delegates of members who have met in the years after the treaty have said, yes, even if a State objects or not, you can certainly use the mail for unofficial purposes, because that doesn't affect any sovereign interest of the State. They don't have a need to object. That structural argument, which is part of Federal law, looking at the structure of treaties, is enough, I would say, by itself to drastically reduce the ambiguity here, and then any remaining nearly textually vanishes when you think about the entire treaty as a whole, which is it's a treaty on service. The title is the Convention on the Service Abroad of Judicial and Extrajudicial Documents. The preamble discusses simplifying service, expediting service, making service more reliable. And in that context, I think the best that Respondent can get to is the idea, well, maybe there's still some remaining ambiguity, because it certainly seems that SEND here is a rule of service. And we have domestic examples where rules of service, after they've made clear we're talking about service, they use common verbs of transmission, SEND, deliver, mail. In Texas, you can effect service by mailing, and so the verb is mail. In that context, the word SEND in Article 10a, although this is a legal argument, this is not practically what happened, but SEND is a perfect word for the directness of the transmission. Every other transmission in the treaty requires some sort of intermediary, whether it's a central authority, a consulate or a diplomatic individual or channel or a judicial officer in the State of Destination. When you're talking about sending through the mail, serving documents, you send them. And it's the only case where you can directly effectuate service. The other of quotation marks, in terms of text, in terms of text, in terms of text, still, the context of certain other words also shows that SEND is used and meant as service. There are three channels, other than the central authority, that are mentioned in the treaty, diplomatic channels, postal channels, and consular channels. All three use the word channels, and that's in Articles 9 and 10. And then later, in Article 11, it talks about channels of transmission. And then later, in Article 21, it speaks of, more generally, methods of transmission. And I think these are also contextual evidence that all the channels that have been discussed are service channels. And then, finally, the — if there is any ambiguity remaining, the extrinsic evidence that this Court has said we can consider, at least absent wholly unambiguous text, is overwhelmingly in support of the idea that, in fact, at the time of drafting, the drafters and those who adopted it at that convention intended to allow service by mail. And the other thing is that there have been a number of countries that have said we don't want you to use mail. They have taken that option. Yes. I have counted, actually, of the 71 countries who have either acceded or ratified the treaty, nearly half, 30, have expressed their objection to mail by lodging a declaration with the government of the Netherlands. And there are a handful who have lodged a qualified objection where they say, well, yes, mail is okay, but if you do it this particular way. So, yes, certainly that number indicates that — and in some cases, such as Canada in this case, their declaration, who doesn't object, specifically states we understand we are saying we don't object to service by mail. And that's not in every case, but several, several of the declarations. Ginsburg. Have positively said we don't object. Yes. If you are right, does Menon, does she get any chance to defend on the merits or if she suffered a default judgment, is that it? In general, that is not it, because the Convention has two provisions in Articles 15 and 16 that enable a person to potentially void a judgment or to extend the time to appeal if certain conditions are shown. Whether that could be introduced in an enforcement proceeding, for example, in Canada, if the judgment were sought to be enforced, if I were on the other side, I would be trying to argue Articles 15 and 16 and try and show there was a problem with the judgment. But at least in the forum State, I think if those articles are not raised at the default judgment stage or within a reasonable time after the judgment. The articles. What are the articles? Articles 15 and 16. No. What do they say? So Article 15 precludes the entry of a default judgment, depending on whether the forum State, and in this case, that's the United States, whether they have opted to go in the first half of Article 15 or the second half of Article 15. The first half of Article 15, based on the first half of Article 15, where does the person get to raise the defense that they didn't actually receive notice? They can certainly raise it in the proceeding where the judgment was entered within a reasonable time after they got actual notice of the judgment. And that's Article 16 specifically. They have to show they didn't have notice. They have to show they had a prima facie defense. And then they could get relief from the finality of it. And if the Court has no further questions, I would reserve the remainder of my time. Thank you, counsel. I didn't think you were Ms. Goldenberg. Ms. Goldenberg. Mr. Chief Justice, and may it please the Court. Article 10a of the Hague Service Convention permits service through postal channels on persons abroad if the law of the forum State, that's the State where the case is pending, authorizes such service, and if the receiving State where the mail will be delivered hasn't objected to Article 10a. And I'd like to start with this permit-authorized framework, because I think there has been a lot of confusion in the lower courts on this subject. The question presented here is perhaps phrased a little inartfully in terms of authorization, and it would be really helpful if this Court would clarify this point. Article 10a says that, provided the State of destination does not object, the present convention shall not interfere with the freedom to send judicial documents by postal channels to persons abroad. So it is not interfering with freedom. It's not the same thing as providing an affirmative authorization for service by mail. That affirmative authorization has to be found elsewhere, and the place where you find it is in the law of the forum State. So, for instance, in our Federal system, if you look at Rule 4 of the Rules of Civil Procedure, there is a subsection of Rule 4 that says, where an international agreement permits but does not authorize service on persons abroad, here are a bunch of things you can do. And some of those options include service by mail using registered mail sent by the clerk of the court, service by mail if the district court judge in a particular case directs it, and so on. So that's where you get the authorization. You have to the forum State has to authorize this service by mail on a person abroad. At the other end of the process, you have to see whether the receiving State has objected to service by mail. And as my friend indicated, nearly half of the countries that have acceded to or ratified this treaty have indeed objected to service by mail. Some of them have given a sort of conditional objection that they will only accept service by mail if it's done in a certain way. Ginsburg. Did they make a distinction, any of them, between the initiating document, the complaint as distinguished from documents later on in the litigation? None of them do, no. None of the statements that countries have made when they've stated whether they object to Article 10a or not simply state either we object to service by mail or we don't. Some of them don't actually use the word service. Many of them do. More than half of them do. Some States that have not objected have also used the word service when they've made that statement. So I think that is an indication, one of many indications, that other contracting parties to this convention, like the United States itself, understand that Article 10a is about service and not simply about some kind of informational mailing. So as I said before, we think it would be helpful if the Court would clarify the permit, authorize, object framework. The court of appeals decision that we think best captures this is the Brockmeyer decision from the Ninth Circuit, which lays this out correctly and also has a very helpful discussion of how Rule 4 interacts with the treaty. Beyond that, as my friend said, there are a lot of textual indications here that this is a convention that is about service. Just to highlight one that he didn't touch on, there is a structural argument, which is that Articles 8, 9, 10b, 10c, 11 are all about alternative channels for service, and it would be very odd for this convention to suddenly jump to something that wasn't about service in Article 10a and then jump back again to service in 10b, 10c, and 11. Sotomayor, why do you think they used a different word? I think my friend correctly gave the reasons, which is there is a historical reason and a practical reason. The historical reason is that I think they simply carried over the French word adresse from the 1954 Civil Procedure Convention that replaced, that this convention replaced, as to States that were parties to both. Adresse had been understood by everyone and it was clear in context to capture service. And so I think if you actually compare the language of the 1954 treaty and the language of Article 10a in French, they are virtually identical. It was just that the drafters carried it over and that that's the way that people understood it. On a practical level, I do think that send is just a very natural way to refer to putting something in the mail, and so it makes sense to use that verb there rather than a different We think the contrary interpretations really don't work here, but at the very least there is ambiguity in this treaty, and at that point this Court's decisions are clear. You turn to extrinsic sources of information. Here, each and every extrinsic source points strongly in the direction of the interpretation we are espousing. You have the history, and that is the draft convention and the contemporaneous understanding of people who were there when it was drafted. You have the consistent interpretation of the executive, which is entitled to great weight, and here has been completely consistent from the beginning until now. You have the consistent interpretation of other contracting parties, which this Court has said are entitled to considerable weight, and you also have an expert consensus among scholars and so on. So affirming the corpola would take us out of step with the rest of the world, 70 other countries are parties to this treaty, and it could be an irritant if they think that we are not living up to our obligations. It also would make service more difficult for U.S. plaintiffs who are looking to serve defendants who are abroad. It would take away from them the ability to use the mails in situations where they might be trying to serve someone in a country where the central authority is slow or expensive. And so for all those reasons, we think that the Court should reverse the judgment below. If the Court has no further questions. Roberts. Thank you, counsel. Mr. Hoopman. Mr. Chief Justice, and may it please the Court. Before I get into the thrust of my argument, I would like to address a couple of questions that came up here. Why was a different word used? Okay. The lead scholar on this, which is cited in both the Solicitor General's brief and my opponent's brief, Bruno Ristow. He's the acknowledged expert in this whole area of extrajudicial service. In his two-volume treatise, he says, he goes through all this talk, all this analysis about all these different cases on this very issue, and then in some, he says it's a mistake. I call this case the case of Bartleby the Scrivener because it turns on this mistake that the lead scholar says that is out there. And so if you look at the obvious section of the treaty on page 8 of the Joint Appendix, under the mistake. Sotomayor, I think that leading scholar, and maybe I'm wrong, but I thought I read it, thought that it may have been a Scrivener's mistake, but the intent was clearly to affect service. He clearly comes down on their side of the camp. That's undoubted. Sotomayor, so this leading scholar calls it a misuse of words, but that the intent was clear for all the reasons everyone else is giving. Exactly. And it also uses a similar analysis that the dissenting opinion in the Texas Court of Appeals said. Basically, you look at all these other things out there beyond the text to come up with. So why is this clear? Your adversary says, isn't the lack of clarity inherent in the question, what do they mean by send? They don't define send. They don't define service. So doesn't that automatically create an ambiguity? And why isn't the ambiguity approached the way the other side says? OK. First of all, I do not think that there is an ambiguity in this particular point that we're all here talking about. And I say that for the reasons that were cited basically in the Fifth Circuit opinion, but whereas if you take the words to affect service, or actually affect service of, and substitute those for send, then it isn't crystal clear for the other side to say, well, I don't really think it's a can, and I think it's more of a rule of usage, that if I alter the word that I'm using throughout a document for something else, well, then I'm trying to alter the message that I'm sending. This is a convention on the service of documents. It's not a convention about sending documents, but it's a convention, everything in this convention relates to service. And the whole purpose of it was to facilitate international cooperation and litigation. No doubt about it. And so just as in this case the service is sought to be made in Canada, there will be cases where courts abroad want to serve somebody in the United States. The whole purpose of this was to make it easier to conduct litigation international to facilitate international cooperation in litigation. No doubt about it. And I would suggest that sending documents that are okay. The question, the follow-up question from what you're saying, Your Honor, would be, well, does it mean just service of initiating documents, service of process? Or service of any judicial documents? Now, the first part of the treaty talks about service of judicial documents. And so it would seem to me logical to include within a treaty that's focusing on service of documents internationally also service of documents after service of process. And so from my perspective, and I think I'm a fairly reasonable man, so from the reasonable person's perspective, you would think that you would include service of other types of documents within a service of process treaty. And now, also, there's a really important extrajudicial, and I'm going to jump into some extra text here. Ginsburg. I'm not grasping what you mean by process. It's on the convention is on the service of documents. Yes. Judicial documents. Yes. And so is the notion of process the way we think about it in the United States, a process server? That's not universal, is it? I mean, a lot of civil law countries don't have the notion of tagging, having a process server tag the defendant. Right. Okay. The history, okay, I do want to jump into some extra textual information, which specifically addresses that and a lot of other things. Okay. So the history of this treaty was such that they were really trying to kill this French method of service in France, notification of, I don't speak French, so, but the Schlunk case talks all about it. And the problem there was, is that an official in France, once you give the citation, the certificate or citation or summons to the official there, that is service. And so defaults were being entered against parties that never actually got notice. And so then the United States had passed a, had passed public law 88-619 in 1964, whereby we allowed foreign countries to come here and to easily effectuate foreign service by going to a district judge and getting an order signed to serve, say, a French or Ugandan or wherever summons on an American or whatever person is in the United States. So they could get judicial assistance from the United States very easily. Okay. So within the context of that act, then the United States went, sent their representatives to the Hague to start getting engaged with this, this Hague conference to normalize international laws. And, and so the motive was to get the other countries to make it easy for our citizens to serve overseas and also to, to push forward due process. Okay. And, and so then the when the drafters, they, they got this, this convention prepared, then they came to the Senate committee and then, then the lead spokesman at that Senate committee was asked specifically, and I have the page here, well, I don't have it handy, but, but basically the, the spokesperson for that for, for America told the Senate, the senators that the only thing America is giving up is the same thing that we had already given in that federal act that I just mentioned. And that federal act doesn't have anything in it about, about mail. So, so the actual lawmakers of the United States that signed off on this treaty were told by the people that participated in the, in the convention drafting that, that we're going to, it wasn't all about service. Like you're saying, Your Honor, it was, it was in large part about due process. And that the only thing that we're giving up is the same thing that we gave up in, in this federal act that I'm talking about. Did we give up, or do you think they thought we were giving up the right to authorize States to permit service by mail? Service by mail was Your position is, is that we did. That in the treaty, we intended, by signing the treaty, to give up the power of States to authorize the service by mail. Service by mail was actually not talked about in the Senate hearings. There was one art. I'm asking you, do you think it's a fair reading of a treaty for us to read it, to constrict the rights of States to affect service consistent with due process? Because there's no doubt that we consider mail service consistent with due process. Okay. The States authorize it, right? Well, under, according to Brockmeyer, the case, the position of the Solicitor General wants the Court to adopt, the actual holding in that case was that the Article 10a does, does not authorize service by mail. It permits it, meaning you've got to look at the local law. I accept that, but many States permit service by mail, correct? Well, Texas doesn't, according to the majority opinion in this case, because all four of my points were sustained in the, in the, in the lower court, and one of those points was specifically whether or not Texas authorizes service by mail. So if you were to But take Rule 4e of the Federal Rules of Civil Procedure. It authorizes service as in the courts of the State where the district court is located. And I think Justice Sotomayor is referring to that some States, not Texas, but some States do authorize service of the summonsing complaint by mail. I'm sure some States somewhere do. They could, theoretically. Let's put it that way. And so then you, then you, then you're with, up to the question of, okay, let me, let me put it this way. In Brockmeyer, the Court said that, that the treaty does not authorize it, but Rule 4f of the Federal Rules of Civil Procedure allows it in some circumstances, namely when the clerk sends it. So the clerk can mail the process, but the party can't. And therefore, I win in my case. Now, in this, in my case, the Texas, the Texas Court of Appeals in majority opinion, actually sustained all four of my issues that were raised in the, in the Court of Appeals. And one of those was, and by the way, the dissent said I wiped that one issue. But, but the majority of that panel sustained it, which, and that issue was whether or not Texas law authorizes service by mail. So if the Brockmeyer logic were to be adopted by this Court, you would basically say, well, yes, the, the, the treaty permits it, permits it being serviced by mail if the local law allows it. And so, yes, it's permitted, but the Texas court has already ruled on it, therefore a decision, the lower court's ruling is affirmed. So, so even if you go this, this route of it's not authorized, but it's permitted, you still have to affirm the, the Texas judgment, because the majority said that  Ginsburg. Well, if it's, if it's permitted under a Federal treaty, then how can Texas not permit it? Because, and this, that took me a long time to figure that distinction out. But basically the question is, and the question that the cert was granted on is whether or not the treaty authorizes service by mail. That means the treaty itself says you can serve pursuant to the treaty by sending it in the mail. Versus the Brockmeyer distinction, which is that the treaty doesn't say that you serve by mail pursuant to the treaty. Rather, the, the treaty allows the other states or the Federal government to pass a rule so that the local law, the local United States law allows service by mail. Okay, so then Brockmeyer worked through that and said, well, yes, rule, rule 4F permits it, but only if the clerk sends it. And since the clerk in that case didn't send it, the default was set aside. And so then, then you take that line of thinking and apply it to my case, and you say, okay, well, no, the treaty doesn't authorize it because we follow the Brockmeyer line of thinking, but it does permit it if Texas law allows it. Well, the Texas court already passed on it and said, in the majority opinion, because they sustained my four issues, Texas law does not authorize service by mail. Sotomayor, I thought I had read this, and I'm looking at it. The blue brief at page 9 says, under Texas law, a plaintiff can serve a foreign defendant in several ways, including by certified mail return receipt requested, either by sending it to any defendant directly, or if certain conditions are met, by sending it to the Secretary of State, by complying with the provisions of any applicable treaty, and if certain other conditions are met, by other court-ordered means. So and there's a citation to the two sections of the Texas Civil Procedure Act. So it seems to me that Texas law on its face authorizes service by certified mail return receipt requested, or by any other court-ordered means. So why was the service here ineffective under Texas law? It's Texas Rural Civil Procedure 108A. It's entitled Service of Process in Foreign Countries. Right. Right. And it has all this stuff that can happen. Basically, there's six different ways that it can occur. So why wasn't the service here pursuant to one of those authorized Texas ways? Well, the short answer is because the Texas court said it was, if the proper way to do it. Now, I think the more sophisticated response to that would be similar to the Brockmire holding, which is, is that because it was sent by the — I walked down to the post office and dropped a summons in the mail and sent it to Uganda or wherever to serve somebody. The Texas court said you can't do that. Now, in the Brockmire case, the specific reason was is because the clerk didn't do that. Now, if the clerk — I send a request to the clerk and I say, hey, please send the summons to Uganda, and they drop it in the mail. That would be appropriate under the Ninth Circuit case. Okay, but the point here is that if you follow the Brockmire line of thinking, you have to — service by mail is proper if our local authority allows it. And in our case, the majority opinion sustained all four points, and one of those points was that Texas law doesn't allow it. And also, you know, the technical — and I don't mean to be overly technical, but we didn't — you didn't grant cert on the question of whether or not the Texas law allows it. We granted on whether or not the treaty authorizes it. And so I've got that holding from the Texas court on the Texas law. I think that's dispositive, assuming you get to that. And the only way you get to that is if you say that the treaty — if you say that the treaty authorizes service by mail, you don't even get into that can of worms, because the treaty itself is the vehicle through which you're serving process. Okay. If you follow the Brockmire line of thinking, you say, well, no, the treaty doesn't authorize it, but it permits it, then you run into the Texas majority holding, which has already ruled on that question. And — Kagan I think it's a problem for your position that no other court in the world has construed the treaty this way. Gershengorn That's clearly a problem. That's why I focus so hard on text. I mean, okay. Roberts Someone's got to be first, right? Gershengorn But now — now, that is why I cited to the — I forgot what they call it, but it's basically the restatement of law in Europe. That's why I cited to that, to see what their mindset is. And I don't know if you recall that quote in my brief, but basically, they will look at a document when they're interpreting it. If it says X, but everyone's intent was Y, they go with Y. And that's — that just runs train — a steam train roller over our separation of powers concept. Kagan Well, this goes back to Justice Alito's question. I mean, is that — is that your answer to it, that it's just they're all construing this because they use a completely different interpretive stance than we do? Gershengorn No doubt about it. It's a whole different mindset. They're — they're looking at the subjectivity of what everybody wanted. And here, because of our separation of powers, who's the lawmaker? That's why Goff and Erie and all that other really interesting stuff. And I think it's actually crucial here, because — Kagan One question, I suppose, might be whether that is, in fact, producing the disparity in — in judgments. But even suppose you're right, that it is. I mean, these are treaties. So the idea that, you know, we would be consistently interpreting a treaty differently from the entire rest of the world would seem to create problems for our treaty-making powers, for our — our ability to conform with what our treaty partners expect. I mean, it would be — it would be sort of a problem for international relations, wouldn't it, if we're like, well, we just interpret everything that we write differently from the way everybody else in the world does? Gershengorn Clearly, we've got to be respectful to our foreign friends. Clearly, we don't want to be — come across as, you know, arrogant, what's we say, so therefore sort of thinking. Okay. We do have also to respect the Constitution. Who — who passes these laws? The lawmakers. Ginsburg You are taking a statement from a — it's not exactly a restatement, it's sort of this European project, written by a law professor in Denmark, and you're saying that's how all Europeans — they don't — you don't think that they have the same debates that we have on the extent to which you go beyond the text? You think they all agree about the way you interpret legislative text, and it's all that what Poula Landau said is — that's true generally? I think you find that they have the same debates that we do. Gershengorn I'm definitely no European legal scholar by any means, but I do believe that that — that site that I gave, I did some research to see how respected it was, and I believe — maybe I'm wrong on that, but I think it's on par with our restatement. Do they — do they do what we do here? Well, if you look at the Vienna Convention — and someone brought that up, by the way. The Vienna Convention says how you're supposed to interpret treaties. They actually do the opposite of that quote that you're — that I gave you, and now you're giving back to me. And they focus hard on text, just like I'm urging the Court to do under our separation of powers doctrine. So I surmise that a fair amount of them do look at that section, but then a whole lot of them, others, also surely look at the Vienna Convention, because they're the ones that — most of the European countries, if not all of them, have actually signed off on it, and the United States has not. But it is — it is a codification of customary international law, and therefore, you know, if — depending on how much emphasis we put on customary international law, we're going to look at the Vienna Convention to help us interpret a treaty, assuming you get beyond the text, like I've urged the Court in the first half of my brief. So in answer to your question — Ginsburg's lawsuit, you cite, is not talking about the interpretation of statutes. It's talking about the interpretation of private contracts between two individuals. That's primarily the — yes, I would agree with that. And I — and I didn't mean to cite to that as, oh, look here, here's my number one site at all. I was just trying to give a perspective on, hey, look, I do have all these international cases against me. Let's look at their mindset a little bit. One of the — I mean, if you are talking about — and I think this is a distinction between statutes and treaties. We visualize treaties, anyways, close to — to contracts. And if you're talking about contracts, it's very important to what the conduct and expectations of the parties were as they went into the contract, and it's significant evidence of sort of how they dealt with the situations after the contract, somewhat unlike how you might interpret a statute. I have a real problem, and I realize the case is a mechanist analogy to contracts, but I have a real problem with that analogy because it doesn't factor in the Constitution. We adopt a treaty and make it a Federal law, just like a Federal statute, except it's done through the precedent and et cetera. And so it's really not — yes, it's like a contract, but no, it's not because this Court has to apply the Constitution to it. And so here, if you have the drafters and then the nice Bartleby's error, the Scribner's error, we're not going to just fix it, because that's legislating, unless — unless the error has, you know, a ridiculous — the absurdity doctrine and it's got a ridiculous — so under — under y'all's authority, you can't just fix the Scribner's error. And so the scholar, Mr. Restall, I thought did me a great favor by, yes, page after page that I lose, I lose, it's Mills, okay, but then he says it's a Scribner's error. So then when you apply the separation of powers doctrine principles to that, you can't just fix it, because there's a logical reason to include service of post — service of process type documents, because it makes perfect — to me it makes perfectly good sense. It doesn't make sense to me to not include that in there. And so if you use the canon of — you call it a canon or a method of usage, and a different word, well, there's a different meaning, if you can see the different meaning, you don't — you don't have an ambiguous situation here. And so you are bound by the Constitution to interpret the words of the — of the treaty and say, well, it's not authorized. So that's kind of how I analyze it. And then — and then I really want — this, to me, is a really big point, and I haven't articulated it well, but the solicitor general cited to the Senate record were the international guys that went over to the Hague and brought this beautiful treaty that they put a whole lot of work into. With the history of this — this Federal statute that I'm talking about, everyone wanted to start cooperating. Then they get before the Senate testifying, and one of the senators is asking something like, well, what do we get out of this? And — and he's got this section in there. It's on — it's on page 24 and 25. He's the U.S. delegate, Philip Amrum, and he said due process, and also we are given nothing we had not already given in public law 88-619. So the senators that actually signed off on this, that's what they heard. And you've got to understand that — that — it's so important I put it in my little book here, okay, that public law 88-619 was a big deal back then because America says, hey, we're going to let the foreigners come over here, go to a district judge, request an order to serve, you know, a French petition or whatever. And then after they — and that was a — you know, that was politically a big deal. We opened our doors, and we want them to open their doors to us. So they go — they go — they go prepare this treaty, and then they come back and testify to the — to the people that are going to actually make our law, and they tell them that's — that's what — what happened. And now we've got this mail thing going on. So — so from the lawmakers' perspective, they didn't actually hear that. Now, there is a Bar Review article that the same man that testified, Mr. Amrum, there's a little section in there, which the Solicitor General sets in their brief, where they say something like service by mail. He's — and I read the article. It goes on and on about this treaty. A little bit mind-numbing, but it's — and then he says article 10A, service by mail. It's a little bitty snippet. You can see it in the Senate record. But it doesn't — it doesn't — service by mail says the same thing that the treaty says. It doesn't say service processed by mail. And so to me, it would seem like you don't have an ambiguity here. There was a change in usage. It makes perfectly good sense to allow service of post, service of processed documents. And you can't fix the Bartleby v. Scrivener error because of y'all's various cases, Chan v. Correa in particular. And then you have the other issue, which is even if we go with this Brockmeyer scenario, then — then Texas has already passed on this question, and Texas law doesn't allow service by the participant by mail. And so you've got to affirm anyway. So if there's no further questions, I'll turn it over to the other side. Roberts. Thank you, counsel. Thank you. Mr. Gaston, you have seven minutes. Thank you, Mr. Chief Justice. Mr. Gaston, would you start with the Brockmeyer question? Do you agree with the government on the issue that the treaty only permits doesn't necessarily authorize? And then your adversary's position that the Texas court has already said that under Texas law, you can't serve this way. Yes, Justice Sotomayor. We — Petitioner agrees with the United States' position, and it points out actually an ambiguity in the word authorize, which is the question presented that — that ambiguity is my responsibility. Because authorize can mean empower or it can mean permit. And in this situation, permit is what the Brockmeyer case reads it as. It's what the United States suggests is correct. And we — we think that is correct because of the ambiguity in the statute of what the freedom to do things means. And — and I would also alert the Court to some more specific discussion of that. The Permanent Bureau of the Hague Conference puts out a handbook every so many years, and the 2016 edition, which is the fourth edition, at paragraph 257, discusses some extrinsic evidence from the 1964 special commission discussions during the drafting, making it clear that it was a two-part test. If the State doesn't object, state of destination, you have to look at the law of the forum and see if it affirmatively authorizes it. Moving then to the — to the contention that the court of appeals here has already ruled that service by mail wasn't allowed under Texas law, that's — that's the result of the holding because the Court held that the treaty preempts Texas law. And — and it — and if the treaty in fact prohibits service of process by mail, it does preempt Texas law. And that's what the — this Court in Schlunk said. It said that the treaty is — is mandatory, and it preempts inconsistent methods of service under — under State or Federal law. But that was not a determination that, apart from the treaty, service of process here was not consistent with Texas law and in our belief. Roberts. Is that preemption question before us? No, I would say it has been — has been decided by this Court in — in — in Schlunk. And the Court — and it cited a prior case. But we're not being asked to rule on that, because I gather the Texas court of appeals has a different view on that. I think the Texas court of appeals has the same view, which is that — that if the Texas law is dead letter, and therefore — But we were told on the other side that Texas law, forget about treaties, Texas law does not permit service of process by mail, period. And that is nowhere in the court of appeals' decision. And the Texas State law determinations that we — this Texas State law that we cite at pages 9 and 10 of the blue brief provide three or four ways in which service of process by mail on a — But if you win in your — this Article 10, in fact, permits service by mail, then you'll go back to Texas and you'll say, see, it permits expressly, so the rest of the treaty doesn't preempt the provision that allows service by mail, so Texas law no longer prohibits it. Is that right? Yes. So we should send it back. It doesn't say that at all. What Article 10 says is whether or not the convention shall interfere with a particular way. So then you simply say, if you're right, okay, the convention doesn't interfere with it, but Texas law can prohibit it. Yes. It could, but you say it doesn't. Yes. That is absolutely our position. But the court of appeals said otherwise? No. The court of appeals held that the Hague Service Convention prohibits service of process by mail, and therefore, it sustained the Respondent's challenge to the trial court judgment on the basis that there was no valid service of process, because the service that was effected was prohibited by the Hague Service Convention. The — So I'm sorry, you're saying it just never got to this question of what Texas law says? Correct. Okay. On our blue brief at 32 and 33, I think it's clear not only did the negotiator for the United States tell the Senate that this treaty involves service — allows service by mail, and the executive branch internally relayed that message to the — to the President. So it's very clear internally that the United States executive branch understood that the United States' intent was it allows service by mail. Respondent makes a distinction between service of process and service of post-answer documents. I think while one might imagine a treaty that would do that, this treaty doesn't make any internal distinctions between judicial documents that are process and other judicial documents, with the limited exception of Article 15 that only talks about getting relief from a default judgment with respect to a summons not — not being served. And so, as one lower court has said, it would be very odd if Article 10a was about service of every judicial document except process, which is what would be required to — to go with Respondent's interpretation. And unless the Court has any further questions, I would cede the rest of my time. Thank you, counsel. The case is submitted.